## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CYNTHIA A. STONE, PATRICIA MARTINEZ, JOSÉ A. CRUZ, JR., ELEDIA TORRES, RONDELL MUHAMMAD, SHARON MUHAMMAD, JAMES M. AMI, SHARON K. AMI, BETTYE JEAN BROWN, MOHSIN M. DHANJI, WAHIDA M. DHANJI, DONNA R. LOVE, EDWARD REVIS, and EXIQUIO CAMACHO, individually and on Behalf of All Others Similarly Situated,<br>    Plaintiffs,<br>        v.<br><br>WASHINGTON MUTUAL BANK; J.P. MORGAN-CHASE & CO.; DLJ MORTGAGE CAPITAL, INC.; DLJ CAPITAL CORP.; CREDIT SUISSE; CREDIT SUISSE (USA), INC.; CREDIT SUISSE GROUP AG; DOUGLAS ROSEMAN; PATRICK A. REMMERT; ANDREW KIMURA; LORI M. RUSSO; BRUCE KAISERMAN; ANGELO BULONE; MICHAEL CRISCITO; JAMES D. CRISCITO; LUBOMIR PENEV; TERENCE DOLCE; SELECT PORTFOLIO SERVICING, INC.; TIMOTHY J. O'BRIEN, DIANE WEINBERGER; CODILIS & ASSOCIATES, P.C.; ERNEST J. CODILIS, JR.; JEANELLE GRAY; CHRISTINA ALLEN; KLUEVER & PLATT LLC; JASON D. ALTMAN; CITIBANK N.A.; WELLS FARGO BANK ; ALLY FINANCIAL, INC. (a.k.a. GMAC MORTGAGE); BANK OF AMERICA N.A.; PNC BANK N.A.; U.S. BANK N.A., HSBC BANK (USA) N.A.,<br><br>    Defendants. | Case No. 10 C 6410<br><br><br><br><br><br><br><br><br>Hon. Matthew F. Kennelly<br>Mag. Judge Finnegan<br><br><br><br><br>Class Action<br><br>For Damages<br>and Equitable Relief<br>under the Racketeer<br>Influenced and Corrupt<br>Organizations Act<br><br><br><br><br><br><br><br>Plaintiffs Demand<br>Trial by Jury |

## AMENDED VERIFIED CLASS-ACTION COMPLAINT

Now come the above-listed Plaintiffs, pursuant to 28 U.S.C.A. § 1331 (Federal Questions), 28 U.S.C.A. § 1367 (Supplemental Jurisdiction), 15 U.S.C. § 1692 *et seq.* (the Fair Debt Collection Practices Act, "FDCPA"), 42 U.S.C. § 1983 (the Ku Klux Klan Act of 1871), Fed.R.Civ. Pro. Rule 23 (Class Actions), and 18 U.S.C.A. §§ 1961-1968 (Racketeer Influence and Corrupt Organizations Act), by their attorney, Robert L. Stone & Assocs., P.C., and and complain against the Defendants as follows:

## <u>NATURE OF THE CASE</u>

1.   Defendants are Credit Suisse and its association-in-fact of banks; its servicing agent, Defendant Select Portfolio Servicing, Inc.; its professional document producers and signers; its shell corporations; and its lawyers that the association-in-fact uses in mortgage-foreclosure cases.  Defendants have combined or confederated among themselves to form an association-in-fact for the purpose, by their joint efforts, of filing false and deceptive documents with State and federal courts in tens of thousands of mortgage-foreclosure cases nationwide for the purpose of illegally seizing and converting homes using straw-man mortgage-foreclosure plaintiffs (that have no interest in the taken properties) and fraudulent documents.  The Defendants are thereby defrauding federal and State courts and injuring the owners of the affected properties, the junior mortgagees of the affected properties, the purchasers of the affected properties, the title companies that insure those purchasers, and the United States—all of which have been injured by Defendants' scheme.

2. The Defendants are engaged in this scheme for two reasons. First, it permits Defendant banks to collect repayments of mortgage loans multiple times for each mortgage: once when they sell the mortgage Note to investors immediately after the Note is signed by the borrower, and a second time when Defendant banks foreclose and sell the collateral. Second, for reasons of tax avoidance, the Defendants have securitized most home mortgage in such a way as to separate ownership of the mortgages from ownership of their mortgage Notes. (All mortgages have two documents. There is a mortgage promissory Note, which is a negotiable instrument signed by the borrower and which spells out the obligations of the borrower. And there is the parallel, reciprocal "mortgage," which is an agreement by the lender about what it has to do before it can collect the collateral in case of default under the Note. The two documents are supposed to remain together.) Once legal ownership of the two documents is separated, or if the "chain of title" to the mortgage Note is "broken," the loans are said to be "bifurcated" and become unsecured debt. Defendants do not want to accept this legal consequence of their tax avoidance and have chosen instead to file fraudulent foreclosures *en masse*. The Defendants are reaping enormous profits from this scheme.

3. Plaintiffs are the homeowners in the United States who have been injured by Defendants' scheme. Plaintiff No. 1 is Cynthia A. Stone. On July 5, 2005, Defendants Washington Mutual Bank and Codilis & Associates, P.C.---later joined by Defendant DLJ Mortgage Capital, Inc., and Defendants

Kluever & Platt LLC and Defendant Jason Altman---did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiffs reside, using fraudulent and deceptive documents, and did sue Mrs. Stone and her husband to foreclose a mortgage that Defendants did not own and did not hold---and for which they had already been paid in full in a transaction they concealed from the foreclosure court and from Plaintiffs.  (Defendants' complaint about the Stones is attached hereto at Exhibit "**A**.")  The Defendants' complaint indicates on its face that no copy of the mortgage Note is attached.  In other words, Defendants not only did not hold the Stones' mortgage Note, but they did not even have an old photocopy of it made before they sold it to the concealed third party (now the owner of the Stones' mortgage Note) over which the fore-closure court has no jurisdiction. Upon information and belief, Defendants did not even notify the holder of the Stones' mortgage Note about the lawsuit.  Nothing that the foreclosure court or the conspirators could have done in that case could possibly have satisfied the Stones' debt to the concealed holder of their Note.

4.    Defendants supported their attempt illegally to seize and convert the Stones' home by attempting to cover up their lack of any cognizable interest in the Stones' property, and to cover up the fact that they do not hold the mortgage Note, by filing two fraudulent and deceptive pseudo-affidavits with the court.  These un-notarized "affidavits" are signed by "Jeanelle Gray" and "Christina Allen," notorious Robo-Signers (see Exhibit "**B**") employed by Fidelity National Foreclosure in Lakeland, Georgia, who have stated under

oath in different "affidavits" that they are employed by MERS, by SunTrust Bank, by EMC, and by Defendants U.S. Bank and HSBC, as well as by Defendant Select Portfolio Servicing, and that they have personal knowledge of the contents of each of these companies' files. (See Exhibit "**C**" for copies of the forged pseudo-affidavits.) The pseudo-affidavits are not notarized (so they are not affidavits), are not on personal knowledge, do not aver that the mortgage or its assignment were properly recorded, do not aver that the signers were the custodians of the Stones' records, do not verify that the copy of the mortgage attached to the complaint is true and correct, and are completely silent as to the big question: who is the (concealed) holder of the Stones' mortgage Note. It is clear that these pseudo-affidavits are frauds on the court and deceptive. Upon information and belief, they also are forged.

5. Defendant Washington Mutual Bank did thereby attempt to seize and convert the Stones' home illegally using fraudulent and deceptive documents, in an attempt to be paid twice and to leave the Stones still in debt to the true (concealed) owner of their mortgage Note.

6. Then, on March 8, 2007, Defendant DLJ Mortgage Capital, Inc., again without the mortgage Note and using the same forged documents---and this time with no recorded assignment of the mortgage or any other interest according to the records of the county Recorder of Deeds---substituted itself into the foreclosure case as a "straw-man" plaintiff, in an attempt to obtain an infinite rate of return on a non-existent investment. (See Plaintiffs' Exhibit "**D**," a title summary by the Office of the Cook County Recorder of Deeds

and Registrar of Titles, dated November 7, 2010, showing no assignment or any other recordable interest owned by Defendant DLJ Mortgage Capital, Inc.) The foreclosure court dismissed Defendants' fraudulent lawsuit against the Stones.

7. The Defendants intentionally, maliciously, willfully, and wantonly injured Mrs. Stone and her family financially and emotionally in pursuit of Defendants' scheme.

8. Plaintiff No. 2 is Ms. Patricia Martinez, who formerly resided at 32 Kristin Circle, Unit #3, Schaumburg, Illinois 60195. On October 7, 2010, Defendants J.P. Morgan-Chase and Codilis & Assocs. did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiff resides, using fraudulent and deceptive documents, and did sue Ms. Martinez to foreclose a mortgage that Defendants did not own and did not hold---and for which they had already been paid in full by a concealed third party. (See the Defendants' complaint against Ms. Martinez attached hereto as Exhibit "**E**.") The Defendants' complaint indicates on its face that no copy of the Note is attached (but that they know that it was for $263,631.48). In other words, Defendants not only did not hold Ms. Martinez's mortgage Note, but they did not even have an old photocopy of it made before they sold it to a concealed third party (now the true owner of her mortgage Note), over which the court has no jurisdiction. Upon information and belief, Defendants did not notify the holder of Ms. Martinez's Note about the lawsuit. Nothing that the foreclosure court or the conspirators could have

done in that case could possibly have satisfied Ms. Martinez's debt to the concealed holder of her mortgage Note.

9.  On June 14, 2010, Defendants caused Cook County Sheriff' Deputy A. Martin, No. 128666, to go to the home of Ms. Martinez, where he forcibly detained her and her property and evicted her from her home. (The report of Deputy Martin is attached hereto at Exhibit "**F**.")

10.  Defendants supported their illegal seizure of Ms. Martinez's home by attempting to cover up their lack of any cognizable interest in Ms. Martinez's property and the fact that they did not hold the mortgage Note, by filing with the court a forged pseudo-affidavit signed by "Whitney K. Cook, Assistant Secretary, Chase Home Finance LLC." (See Exhibit "**G**" hereto.) The pseudo-affidavit is not notarized (so it is not an affidavit), is not on personal knowledge, does not aver that the mortgage was properly recorded, does not aver that Ms. Cook was the custodian of Ms. Martinez's records, does not verify that the copy of the mortgage attached to the complaint is true and correct, and is completely silent as to the big question: who or what is the (concealed) holder of Ms. Martinez's Note. Moreover, Whitney K. Cook is a notorious Robo-Signer who claims under oath and penalty of perjury that she is, often on the same day, an employee of each of the Defendant banks, including but not limited to J.P. Morgan-Chase, Bank New York Mellon, Deutsche Bank, U.S. Bank, Lehman Brothers, Federal National Mortgage Association, New Century, Citibank, HSBC, the Federal National Mortgage Association, LaSalle Bank National Association, Wells Fargo, Bank of

America, etc., and has personal knowledge of the content of their mortgage files. (See Exhibit "**H**.") The pseudo-affidavit clearly is a fraud on the court and deceptive. Upon information and belief, it is also forged.

11. A mortgage Note is a negotiable instrument, like a check written on a bank account. What Defendants did in this case is closely analogous to their walking--without a check in hand--into a bank where Ms. Martinez has a checking account and asking the teller to withdraw $263,631.48 from Ms. Martinez's account and give it to Defendants, because they claim without written evidence that Ms. Martinez once wrote a check for that amount to someone else. Then, this being Chicago, the teller hands the $263,631.48 to the Defendants, and they walk out with the money. Ms. Martinez is still liable to the bearer of the check. That this can happen with $263,631.48 is not just illegal. It is outrageous and oppressive. The Defendants intentionally, maliciously, willfully, and wantonly injured Ms. Martinez and her family financially and emotionally in pursuance of Defendants' scheme.

12 Plaintiff family No. 3 is José A. Cruz, Jr., and Eledia Torres, formerly of 6100 N. Damen Avenue, Unit 1, Chicago, lIllinois 60659. On October 17, 2008, Defendants Citibank and Codilis & Associates did know-ngly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiffs resides, using fraudulent and deceptive documents, and did sue Mr. Cruz and Mrs. Torres to foreclose a mortgage that Defendants did not make, did not own, did not hold---and which had never been assigned to Defendants. (For a copy of the Defendants'

foreclosure complaint against Mr. Cruz and Mrs. Torres, see Exhibit "**I**" attached hereto.)    A copy of the mortgage Note signed by Mr. Cruz for $220,500.00 is attached to the foreclosure complaint this time, but that Note was made by Mr. Cruz for the benefit of the lender, "American Home Mortgage Acceptance, Inc." According to this old copy ace of that Note, it was never assigned to anyone but is still held by the American Home Mortgage Acceptance, Inc. (over which the mortgage-foreclosure court has no jurisdiction).    In other words, Defendants not only did not hold Mr. Cruz's mortgage Note.  Further, they had no cognizable or recorded interest of any kind in Mr. Cruz's property.  Nothing that the court or the conspirators could have done in that case could possibly have satisfied Mr. Cruz's debt to American Home Mortgage Acceptance, Inc, or its (concealed) assignee.

13.   On September 11, 2009, the Defendants, having illegally driven Mr. Cruz and his family from their home by threat of forcible entry and detainer, seized it, converted it, sold it, and retained all of the profits therefrom.

14.   Defendants supported their illegal seizure of Mr. Cruz's and Mrs. Torres's home by attempting to cover up their lack of any cognizable interest in the property and the fact that they did not hold the mortgage Note, by filing with the foreclosure court a forged pseudo-affidavit signed by someone at "EMC Mortgage Corporation" whose signature is unnotarized and intentionally illegible.  (For a copy of the pseudo-affidavit used against Mr. Cruz, see Exhibit "**J**" hereto.)  EMC Mortgage Corporation is a buyer of underper-

forming mortgages. There is no evidence of an agency relationship between the fraudulent straw-man plaintiff (Citibank N.A), and EMC Mortgage Corporation, and the mortgage Note was not assigned to either of them. Again, the true holder of the mortgage Note is concealed. The pseudo-affidavit is not notarized, is not on personal knowledge, does not aver that the mortgage was properly recorded, does not aver that the signer was the custodian of Mr. Cruz's records, does not verify that the copy of the Note and mortgage attached to the foreclosure complaint are true and correct, and is completely silent as to the big question: the location of the mortgage Note and the identity of its holder. The pseudo-affidavit does not even say that the signer has ever seen the Note. The pseudo-affidavit is clearly fraud on the court and deceptive. How much EMC was paid for this is not stated.

15. Mortgage Notes are negotiable instruments. What Defendants did in this case is closely analogous to their walking into a bank where Mr. Cruz has a checking account, presenting to the teller an old photocopy of an old check that Mr. Cruz wrote to someone else for $220,500.00, which photocopy indicates that the check was not endorsed, and asking the teller to cash it. This being Chicago, the teller accepts the photocopy, he hands the $220,500.00 to the Defendants, and they walk out with the money. Now Mr. Cruz is still liable for $220,500.00 to the holder of the check he wrote. That this can happen with an old photocopy of an unendorsed old check for $220,500.00 is not just illegal. It is outrageous and oppressive. The Defendants intentionally, maliciously, willfully, and wantonly injured Mr.

Cruz and his family financially and emotionally in pursuance of Defendants' scheme.

16.   Plaintiff family Number 4 is Rondell Muhammad and Sharon Muhammad, formerly of 9220 Bennett Avenue, Skokie, IL 60076.   On October 9, 2008, Defendants Wells Fargo Bank N.A. and Kluever & Platt LLC did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiffs reside, using fraudulent and deceptive documents, and did sue the Muhammads ostensibly to foreclose a mortgage that Defendants did not own and did not hold---and for which they had already been paid in full by a (concealed) third party.  The Defendants' complaint attaches a copy of a Note for $439,850.00 signed my Mr. Muhammad, but it is made for the benefit of "Argent Mortgage Company LLC," and it is not assigned to anyone.  Mortgage Notes are assigned to a Trust immediately after they are made.  In other words, Defendants do not hold the Muhammads' mortgage Note, instead they have only an old photo-copy of it made before Argent Mortgage Company LLC assigned it to the concealed third-party Trust (now the owner of the Muhammads' mortgage Note), over which the foreclosure court has no jurisdiction.  Upon information and belief, Defendants did not notify the Trust about the lawsuit against the Muhammads and the windfall profit to the Defendants.  Nothing that the foreclosure court or the conspirators could have done in that case could possibly have satisfied the Muhammads' debt to the concealed holder of their

Note. (Defendants' foreclosure complaint about the Muhammads is attached hereto at Exhibit "**K**.")

17.   Defendants supported their illegally seizure of the Muhammads' home by attempting to cover up their lack of any cognizable interest in the Muhammads' property and the fact that they do not hold the mortgage Note, by filing a fraudulent and deceptive affidavit with the court. (A copy of this affidavit is attached hereto as Exhibit "**L**.")   The affidavit is signed by Ms. Merlobel Custodio, an employee of Defendant Select Portfolio Servicing, Inc., who says that she had diligently searched "the files" and cannot find the Note. Since a servicing agency cannot be a holder of a mortgage Note, this should be surprising. This affidavit is an attempt by Defendants to deceive the court by giving the false impression that the chain of title to the mortgage Note, although broken, has been repaired. But Ms. Custodio significantly does not state who is the (concealed) holder of the Note, who was the holder of the Note, or to whom the Note might have been assigned.   In fact, she does not identify "the files" into which she looked. Either she does not know who is the holder of the Muhammads' mortgage Note (in which case the affidavit is a fraud on the court), or she is keeping it secret (in which case the affidavit is a fraud on the court).

18.   On June 2, 2010, the Defendants, having illegally driven the Muhammads and their family from their home by threat of forcible entry and detainer, seized it, converted it, sold it, and retained all of the profit there-from.

19. Mortgage Notes are negotiable instruments, like bank drafts on checking accounts. What Defendant did in this case is closely analogous to waking into a bank where the Muhammads have a checking account, producing an old photocopy of a check that Mr. Muhammad wrote for $439,850.00 to someone else, which photocopy shows no endorsement, and asking the teller to cash the photocopy. This being Chicago, the teller accepts the photocopy, he hands the $439,850.00 to Defendants, and they walk out with it. Now Mr. Muhammad is still liable for $439,850.00 to the holder of the check he wrote to Argent. That this can happen with an old photocopy of an old check for $439,850.00 is not just illegal. It is outrageous and oppressive. The Defendants intentionally, maliciously, willfully, and wantonly injured the Muhammads and their family financially and emotionally in pursuance of Defendants' scheme.

20. The fifth Plaintiff family is James M. Ami and Sharon K. Ami of 7023 West Wrightwood Avenue, Chicago, Illinois 60707. On October 8, 2008, Defendants GMAC Mortgage (a/k/a/ Ally Financial, Inc.) and Codilis & Associates P.C. did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiffs reside, using fraudulent and deceptive documents, did sue the Amis to foreclose a mortgage that Defendants did not own and did not hold--and for which they had already been paid in full by an concealed third party. (Defendants' foreclosure complaint about the Amis is attached hereto at Exhibit "**M**.") This time, an old photocopy of the mortgage Note, made my Mr. Ami for

$286,400.00, is attached to the foreclosure complaint. However, in that Note Mr. Ami promises to pay "Homecomings Financial LLC." The old copy of the Note that Defendants attach to the foreclosure complaint had not yet been assigned when the copy was made. (Mortgage Notes are assigned to Trusts immediately after they are first made.) In other words, Defendants do not have a current copy of Mr. Ami's mortgage Note and have no assignment by "Homecomings Financial LLC" to anyone. (A current copy would show the assignment to the concealed holder, and Defendants entire scheme is to conceal that information.) Therefore, based on the documents presented by the Defendants, "Homecomings Financial LLC" must be presumed to be the holder of the mortgage Note, and GMAC Mortgage, the straw-man plaintiff, must own no cognizable interest of any kind in the Amis' home. (Upon information and belief, the truth is that Homecomings assigned the Note, after it was photocopied, to a REMIC Trust, and Defendants are concealing that fact and the identity of that Trust, not for honest reasons.) The court has no jurisdiction over the holder of the Note to whom the Amis still owe their debt. Nothing that the court or the conspirators could have done in that case could possibly have satisfied the Amis' debt to the (concealed) holder of their Note.

21. Defendants supported their illegal seizure of the Amis' home by attempting to cover up their lack of any cognizable interest in the property, and the fact that they did not hold the mortgage Note, by filing with the court a forged pseudo-affidavit (See Exhibit "**N**.") This pseudo-affidavit is not

notarized (so it is not an affidavit), is not on personal knowledge, does not aver that the mortgage was property recorded, does not aver that the signer is or was the custodian of the Amis' records, does not verify that the copy of the Note and mortgage attached to the complaint are true and correct, and is completely silent as to the big question: who or what is the holder of the Amis' mortgage Note. This pseudo-affidavit is a fraud on the court.

22. On May 21, 2009, Defendants, having defrauded the foreclosure court, caused a judgment of foreclosure to be entered against the Amis and thereby converted the Amis' home to Defendants' use.

23. Mortgage Notes are negotiable instruments. What the Defendants did in this case is closely analogous to their walking into a bank where the Amis have a checking account, presenting to the teller an old photocopy of an old check that Mr. Ami wrote to someone else for $286,400.00, which photocopy is not endorsed, and asking the teller to cash the photocopy. This being Chicago, the teller accepts the photocopy, he hands the $286,400.00 to the Defendants, and they walk out with it. Now the Amis are still liable to the holder of the check they wrote. That this can happen with an old photocopy of an old check for $286,400.00 is not just illegal. It is outrageous and oppressive. The Defendants intentionally, maliciously, willfully, and wantonly injured the Amis and their family financially and emotionally in pursuance of Defendants' scheme.

24. The sixth Plaintiff family is that of Ms. Bettye Jean Brown of 11811 South State Street, Chicago, Illinois 60628. On October 8, 2008,

Defendants Wells Fargo Bank and Codilis & Associates P.C. did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiff resides, using fraudulent and deceptive documents, did sue Ms. Brown to foreclose a mortgage that Defendants did not own and did not hold--and for which they had already been paid in full by a concealed third party. This time again, Defendants attached an old photo-opy of the mortgage Note to the Complaint. However, Ms Brown made out the Note to "Capital Mortgage Services, LLC, an Illinois Limited Liability Corporation." (A certified copy of Defendants' complaint against Ms. Brown, with the mortgage Note included, is attached hereto as Exhibit "**O**.") The old copy of the Note that Defendants attached to the complaint had not yet been assigned when the copy was made. (Mortgage Notes are assigned to Trusts immediately at the time they are first made.) In other words, Defendants are concealing a current copy of Ms. Brown's mortgage Note and show no assignment from "Capital Mortgage Services, LLC" to anyone. Therefore, based on the documents presented by the Defendants, "Capital Mortgage Services, LLC" must be the holder of the mortgage Note, and Defendant Wells Fargo is nothing more than a straw man with no interest in Ms. Brown's property. (Upon information and belief, the truth is that Capital Mortgage Services LLC assigned the Note, immediately after photocopying it, to a REMIC Trust, and Defendants are concealing that fact and the identity of that Trust, not for honest reasons.)

25. The Defendants' plan of extortion succeeded and Ms. Brown refinanced her mortgage, making payment in full to the straw-man plaintiff, Defendant Wells Fargo, and continuing to owe the amount of her original mortgage, either to "Capital Mortgage Services, LLC" or to its (concealed) assignee.

26. The Defendants intentionally injured Ms. Brown and her family financially and emotionally in pursuance of Defendants' scheme.

27. The seventh Plaintiff family is that of Mohsin M. Dhanji and Wahida M. Dhanji, formerly of 75 Kristin Circle #409, Schaumburg, Illinois 60195. On February 11, 2010, Defendants PNC Bank N.A. and Codilis & Associates P.C. did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiffs reside, and using fraudulent and deceptive documents did sue the Dhanjis to foreclose a mortgage that Defendants did not make, did not own, did nothold--- and which had never been assigned to Defendants. (A copy of the Docket Sheet in Defendants' foreclosure-court case against the Dhanjis is attached hereto as Exhibit "**P**," and a copy of the mortgage Note signed by the Dhanjis for $120,700.00 is attached hereto as Exhibit "**Q**.") In the Note, the Dhanjis' promise to repay the loan to the lender: "National City Mortgage, a division of National City Bank." It is evident from the face of that Note that, at the time the photocopy was made, years ago, the Note had not been assigned to anyone. So we must assume that the Note is still held by "National City Mortgage, a division of National City Bank," not by straw-man plaintiff,

Defendant PNC Bank N.A.. The mortgage-foreclosure court has no jurisdiction over National City Mortgage. (Upon information and belief, the truth is that National City Mortgage, immediately after making the photocopy that Defendants show to the foreclosure court, assigned the mortgage Note to a REMIC Trust, and Defendants are concealing that fact and the identity of that Trust, not for honest reasons.) In other words, Defendants not only did not hold the Dhanjis' mortgage Note. They also had no cognizable or recorded interest of any kind in the Dhanjis' property. Nothing that the foreclosure court or the conspirators could have done in that case could possibly have satisfied the Dhanjis' debt to National City Mortgage or its possible assignee.

28. Defendants supported their illegal seizure of the Dhanjis' home by attempting to cover up their lack of any cognizable interest in the property and the fact that they did not hold the mortgage Note, by filing with the court a forged pseudo-affidavit signed by "PNC Bank N.A., By: Teresa S. Clopp, Authorized Officer." (A copy of the pseudo-affidavit used against the Dhanjis is attached hereto as Exhibit "**R**.") The pseudo-affidavit is not notarized (so it is not an affidavit), is not on personal knowledge, does not aver that the mortgage was properly recorded, does not aver that Ms. Clopp is or was the custodian of the Dhanjis' records, does not verify that the copy of the Note and mortgage attached to the complaint are true and correct, and is completely silent as to the big question: where is the Dhanjis' Note, and who or what is the holder of it. Also, upon information and belief, Teresa S.

Clopp is not an employee of PNC Bank N.A. (See Exhibit "**S**" hereto.) If so, the pseudo-affidavit is not only fraudulent and deceptive, but it also is forged.

29.    The Defendants, having illegally driven the Dhanjis and their family from their home by threat of forcible entry and detainer, seized it, converted it, sold it, and retained all of the profit therefrom.

30.  Mortgage Notes are negotiable instruments. What the Defendants did in this case is closely analogous to walking into a bank where the Dhanjis have a checking account, presenting an old photocopy of an old check that the Dhanjis wrote to someone else for $120,700.00, which photocopy is not endorsed, and asking the teller to cash the photocopy. This being Chicago, the teller accepts the photocopy, hands the $120,700.00 to the Defendants, and they walk out with the money.   Now the Dhanjis are still liable to the holder of the check they wrote, who can cash it at any time.  That this can happen with an old photocopy of an old check for $120,700.00 is not just illegal.  It is outrageous and oppressive. The Defendants intentionally, maliciously, will-fully, and wantonly injured the Dhanjis and their family financially and emotionally in pursuance of Defendants' scheme.

31   The eighth Plaintiff family is that of Ms. Donna R. Love and Mr. Edward Revis, formerly of 4253 West Wilcox Street, Chicago, Illinois 60624. On October 7, 2008, Defendants U.S. Bank N.A. and Codilis & Associates P.C. did knowingly conspire together under color of statute, ordinance, regu-lation, custom, or usage of the State in which Plaintiffs reside, and using fraudulent and deceptive documents, did knowingly sue Ms. Love to foreclose

a mortgage that Defendants did not make, did not own, did not hold---and which had never been assigned to Defendants. (A copy of Defendants' foreclosure complaint against Ms. Love is attached hereto as Exhibit "**T**," which includes an old copy of the mortgage Note signed by Ms. Love for $212,500.00.) Ms. Love in the Note promises to repay the amount of the loan to the lender, "Decision One Mortgage Company LLC." The Note was immediately assigned by the lender in blank. Therefore Ms. Love's debt is owed to the bearer of her mortgage Note. The straw-man plaintiff in Ms. Love's foreclosure case is "U.S. Bank National Association as Trustee for RASC 2006KS1," but the copy of the mortgage Note that Defendants showed to the foreclosure court indicates that the Note was not assigned to the straw-man plaintiff or to the Trust. There is no evidence that the mortgage-foreclosure court has jurisdiction over the (concealed) holder of the Note. In other words, upon information and belief, Defendants not only did not hold Ms. Love's mortgage Note. Further, they had no cognizable or recorded interest of any kind in Ms. Love's property. Nothing that the court or the conspirators could have done in that case could possibly have satisfied Ms. Love's debt to the (concealed) holder of her mortgage Note.

32. Defendants supported their illegal seizure of Ms. Love's home by attempting to cover up their lack of any cognizable interest in the property, and to cover up the fact that they did not hold the mortgage Note, by filing with the court a pseudo-affidavit signed by "Jeffrey Stephan, Limited Signing Officer." (A copy of Jeffrey Stephan's pseudo-affidavit is attached hereto as

Exhibit "**U**.")  The pseudo-affidavit is not notarized (so it is not an affidavit), is not on personal knowledge, does not aver that the mortgage was properly recorded, does not aver that Jeffrey Stephan was the custodian of Ms. Love's records, does not verify that the copy of the Note and mortgage attached to the complaint are true and correct, and is completely silent as to the big question: where is the Note and who is its holder.  Moreover, Jeffrey Stephan is not an employee of the straw-man foreclosure plaintiff, U.S. Bank N.A., at all but rather is the most notorious Robo-Signer in the United States, and has testified under oath that he signs between 8,000 and 12,000 (necessarily false) affidavits in foreclosure cases each month.  (See "Deposition of Jeffrey Stephan" in *GMAC Mortgage, LLC, v. Neu* [Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida, Case No. 50 2008 CA 040805 MB], published at wwww.TheForeclosureFraud.com, p. 6, and Plaintiffs' Exhibit "**V**," Lynn E. Szymoniak, "Highlights from a Deposition of Jeffrey Stephan," *Fraud Digest*.)  So the pseudo-affidavit is not only clearly fraudulent and deceptive.  It also is forged.  All of this fraud is for the purpose of concealing the identity of the holder of the Note.

33.   On July 22, 2009, the Defendants, having illegally driven Ms. Love and Mr. Revis and their family from their home by threat of forcible entry and detainer, seized their home, converted it, sold it, and retained all of the profit therefrom.

34.   Mortgage Notes are negotiable instruments, like drafts on bank checking accounts.  What the Defendants did is this case is closely analogous

to walking into a bank where Ms. Love has a checking account and presenting to the teller a photocopy of an old check that Ms. Love wrote to someone else, which photocopy is endorsed but not to the Defendants. This being Chicago, the teller accepts the photocopy, he hands the $212,500.00 to the Defendants, and they walk out with the money. Now Ms. Love is still liable to the bearer of the check she wrote, who can cash the check at any time. That this can happen with an old photocopy of an old check for $212,500.00 is not just illegal. It is outrageous and oppressive. The Defendants intentionally, maliciously, willfully, and wantonly injured Ms. Love and Mr. Revis and their family financially and emotionally in pursuance of Defendants' scheme.

35. The ninth Plaintiff is Exiquio Camacho, formerly of 16116 Prairie Avenue, South Holland, Illinois 60473. On October 7, 2008, Defendants HSBC Bank (USA) N.A. and Codilis & Associates P.C. did knowingly conspire together under color of statute, ordinance, regulation, custom, or usage of the State in which Plaintiff resides, and using fraudulent and deceptive documents, did knowingly sue Mr. Camacho to foreclose a mortgage that Defendants did not make, did not own, did not hold---and which had never been assigned to Defendants. Furthermore, the original lender had already been repaid in full. (A copy of Defendants' complaint against Mr. Camacho, including an old copy of Mr. Camacho's mortgage Note for $134,400.00, is attached hereto as Exhibit "**W**.") The mortgage Note was made by Mr. Camacho to the lender, "MortgageIT, Inc.," on January 30, 2007,

and immediately assigned in blank to a concealed party. Therefore Mr. Camacho's debt is owed to the (concealed) holder of her mortgage Note. The straw-man plaintiff in Mr. Camacho's foreclosure case is "HSBC Bank USA, National Association, as Trustee for the holders of the certificates issued by Deutsche Alt-A Securities Mortgage Loan Trust Series 2007-3." But the copy of the mortgage Note that Defendants show to the foreclosure court was never assigned either to the straw-man plaintiff or to the Trust. There is no evidence that the mortgage-foreclosure court has jurisdiction over the (concealed) holder of the Note. In other words, upon information and belief, Defendants not only did not hold Mr. Camacho's mortgage Note. Further, they had no cognizable or recorded interest of any kind in Mr. Camacho's property. Nothing that the foreclosure court or the conspirators could have done in that case could possibly have satisfied Mr. Camacho's debt to the (secret?) holder of his mortgage Note.

36. Defendants supported their illegal seizure and conversion of Mr. Camacho's home by attempting to cover up their lack of any cognizable interest in the property, and to cover up the fact that they did not hold the mortgage Note, by filing with the court a pseudo-affidavit signed by Defendant Wells Fargo Bank NA. (A copy of Defendant Wells Fargo's pseudo-affidavit is attached hereto as Exhibit "**X**.") The pseudo-affidavit is not notarized (so it is not an affidavit), is not on personal knowledge, does not aver that the mortgage was properly recorded, does not aver that the signer was the custodian of Ms. Love's records, does not verify that the copy of the

Note and mortgage attached to the complaint are true and correct, and is completely silent as to who or what is the holder of Mr. Camacho's mortgage Note. So the pseudo-affidavit clearly is a fraud on the court and deceptive. Again, all of this fraud is for the purpose of concealing from the foreclosure court the identity of the holder of the Note.

37. On June 8, 2009, the Defendants, having illegally driven Mr. Camacho and his family from their home by threat of forcible entry and detainer, seized their home, converted it, sold it, and retained all of the profit therefrom.

38. A mortgage Note is a negotiable instrument, like a bank draft on a checking account. What the Defendants did is this case is closely analogous to walking into a bank where Mr. Camacho has a checking account and presenting to the teller an old photocopy of an old check that Mr. Camacho wrote to someone else for $134,400.00, which photocopy shows that the check was endorsed, but not to the Defendants. This being Chicago, the teller accepts the photocopy, he hands the $134,400.00 to the Defendants, and they walk out with the money. Now Mr. Camacho is still liable to the bearer of the check her wrote, who can cash it at any time. That this can happen with an old photocopy of an old check for $134,400.00 is not just illegal. It is outrageous and oppressive. The Defendants intentionally, maliciously, willfully, and wantonly injured Mr. Camacho and his family financially and emotionally in pursuance of Defendants' scheme.

39.   One of Plaintiffs' attorneys has examined hundreds of foreclosure cases filed by the Defendants during the two years before the Complaint in this case was filed.  In not one of these hundreds of cases do the documents that Defendants choose to show to the foreclosure court indicate the assignment of the mortgage Note to the REMIC trust that purchased the Note immediately after the Note was made.  Every single case shows a broken chain of title.  It is clear that Defendants, using the scheme alleged in this Complaint, have illegally seized and converted tens of thousands of homes and destroyed tens of thousands of second mortgages, by claiming interests that they did not show and were not recorded in the records of the county Recorders of deeds.  Why they have done this is not yet clear.  Upon information and belief, all of this massive and elaborate fraud is to conceal from the public record the identity of the holders of the mortgage Notes, for two purposes: (a) evading taxes and (b) concealing from the holders of the Notes that their mortgages have gone into foreclosure, which would make the Defendants vulnerable to lawsuits brought by the investors who purchased the mortgage Notes from the Defendants.

40.   This action also is a class action on behalf of the following Class:

**All present and former owners of residents whose homes are being, or have been, the subject of a foreclosure suit by the Defendants using securitized, bifurcated mortgages or broken chains of title during the two years before the filing of this action (the "Class Period").**

41.   This case also is a civil R.I.C.O. ("Racketeer Influenced and Corrupt Organizations Act," 18 U.S.C. §§ 1961-1968) action asking triple actual damages, punitive damages, and attorneys' fees for all members of the Class.

## THE PARTIES

42.   The Parties to this case include:

    a.   Plaintiffs, at all relevant times, are or were the owners of homes;

    b.   Defendant **Washington Mutual Bank,** the original plaintiff in *Washington Mutual Bank v. Stone*, 05 CH 11143 (Cook County, Illinois), after selling the Stones' mortgage Note, filed that case against the Stones without any mortgage Note and with fraudulent documents; in 2008, all of Washington Mutual's remaining mortgage assets (including the mortgage but not the mortgage Note) were seized by the F.D.I.C. and sold to Defendant J.P. Morgan Chase & Co., but no transfer of the Stones' mortgage ever has been recorded with the Recorder of Deeds of Cook County;

    c.   Defendant **J. P. Morgan-Chase & Co.** is the successor in interest to the mortgage assets of Defendant Washington Mutual Bank and, according to the documents in the Office of the Recorder of Deeds of Cook County, is the owner of the mortgage on the Stones' home; but J.P. Morgan-Chase denies all interest in the home and, claiming that it does not own the mortgage Note, will not accept mortgage payments from the Stones;  J.P. Morgan-Chase also illegally seized and converted the home of named Plaintiff Patricia Martinez;  J.P. Morgan-Chase is used by Defendants in fraudulent mortgage-foreclosure cases without having any ownership interest in the foreclosed properties;

    d.   Defendant **DLJ Mortgage Capital, Inc.**, a wholly owned subsidiary of Credit Suisse, intervened as plaintiff in *Washington Mutual v. Stone*, alleging that it, not J.P. Morgan-Chase, owns the mortgage on the Stones' home but, after years of litigation, has produced no admissible evidence of any interest in the Stones' home; DLJ Mortgage Capital is

used by the Defendants as a straw-man plaintiff in fraudu-
lent mortgage-foreclosure cases, without having an interest
in the foreclosed properties; DLJ Mortgage Capital, Inc., is a
shell corporation that has no capitalization and no telephone
number, and its mailing address is simply that of Defendant
Credit Suisse in New York;

e.   Defendant **DLJ Capital Corp**., another wholly owned subsi-
diary of Credit Suisse, upon information and belief, is used
by the Credit Suisse Defendants to receive funds from Defen-
dant DLJ Mortgage Capital, Inc.;

f.   Defendant **Select Portfolio Servicing, Inc.**, another wholly
owned subsidiary of Credit Suisse, is used by the Defendants
to obtain or produce forged documents and to organize and
assign straw-man plaintiffs in tens of thousands of mortgage-
foreclosure cases nationwide, without evidence of ownership,
including; employees of Select Portfolio Servicing, Inc.,
involved in Defendants' scheme include Defendant **Timothy
J. O'Brien,** the President of Defendant Select Portfolio Ser-
vicing, Inc., and Defendant **Diane Weinberger,** a document
signer employed by Defendant Select Portfolio Servicing, who
signed DLJ's Third Amended Complaint against the Stones
in mortgage-foreclosure court;

g.   Defendant **Credit Suisse (USA), Inc.,** which is owned and
controlled by Defendant **Credit Suisse Group AG,** is a
large Wall Street bank that does business throughout the
United States; it owns Defendants DLJ Mortgage Capital,
Inc.; DLJ Capital Corp.; and Select Portfolio Servicing, Inc.
and is the enterprise into which the Credit Suisse Defen-
dants invest the proceeds of their scheme;

h.   In addition to the above, the "Credit Suisse Defendants"
include the employees of Credit Suisse and/or it subsidiaries
that, upon information and belief, were involved in *Washing-
ton Mutual v. Stone* and therefore in Defendants' scheme.
These include Defendants **Douglas Roseman**, Vice Presi-
dent of Defendant DLJ Mortgage Capital, Inc. is an employee
of Defendant Credit Suisse; Defendant **Patrick A. Rem-
mert**, an officer of Defendant DLJ Mortgage Capital, Inc.,
and an officer of Defendant Select Portfolio Servicing, is an
employee of Defendant Credit Suisse; Defendant **Andrew A.
Kimura,** the President of Defendant DLJ Mortgage Capital,
Inc., is an employee of Defendant Credit Suisse; Defendant

**Lori M. Russo,** Secretary of multiple Defendants including DLJ Mortgage Capital, Inc., DLJ Capital Corp., and Credit Suisse (USA), Inc., is a lawyer employed by Defendant Credit Suisse; Defendant **Bruce Kaiserman**, Director and Vice President of Defendant DLJ Mortgage Capital, Inc., is a lawyer employed by Defendant Credit Suisse; Defendant **Angelo Bulone**, an officer of DLJ Mortgage Capital is an employee of Defendant Credit Suisse; Defendant **Michael Criscito**, Vice President of Defendant DLJ Mortgage Capital, Inc., is an employee of Defendant Credit Suisse; Defendant **James D. Criscito**, an officer of DLJ Mortgage Capital, Inc., is an employee of Defendant Credit Suisse; Defendant **Lubomir Penev**, an officer of Defendant DLJ Mortgage Capital, Inc., is an employee of Defendant Credit Suisse; and Defendant **Terence Dolce,** an officer of Defendant DLJ Mortgage Capital, Inc., is an employee of Defendant Credit Suisse;

i. Defendant **Ernest J. Codilis, Jr.,** a lawyer and owner and manager of Defendant **Codilis & Associates, P.C.**, a high-volume "mortgage-foreclosure mill" based in Burr Ridge, Illinois, is the attorney who filed the fraudulent documents against eight of the nine named Plaintiffs and has participated in thousands of illegal seizures and conversions of homes;

j. Defendants **Jeanelle Gray and Christina Allen,** professional outside "robo-signers" employed by Fidelity National Foreclosure in Lakeland, Georgia, are used in many cases by Defendants; their signatures appear on forged affidavits (Exhibit "C") filed by Defendant Codilis & Assocs. on behalf of Defendant Washington Mutual Bank, in support of its attempt illegally to seize and convert the home of the Stones, which affidavits are intended to give the false impression that the signers are employees of Defendant Select Portfolio Servicing, Inc., and that they have personal knowledge of the case;

k. Defendant **Kluever & Platt LLC**, a law firm in Chicago that was used by Defendants to represent Defendant DLJ Mortgage Capital, Inc., in its attempt illegally to seize and convert the home of Plaintiffs Robert and Cynthia Stone and to represent Wells Fargo in its illegal seizure and conversion of the home of Plaintiffs Rondell and Sharon Muhammad, by defrauding the foreclosure court; Defendant **Jason D.**

**Altman is** the partner of Kluever & Platt LLC who attempt-
ed to defraud the court in the case of the Plaintiffs Stone,
using fraudulent documents;

l.  Defendant **Citibank N.A.** uses Defendant Codilis & Assocs.
illegally to seize and convert dozens of homes each year using
fraudulent documents and is under investigation by several
States' attorneys general and by the Office of the Comptrol-
ler of the Currency;  Defendant Citibank N.A. did illegally
seize and convert the home of Plaintiff José A. Cruz, Jr.;

m.  Defendant **Wells Fargo Bank** uses Defendants Codilis &
Assocs. and Kluever & Platt illegally to seize and convert
dozens of homes each year using fraudulent documents and
is under investigation by several States' attorneys general
and by the Office of the Comptroller of the Currency; Defen-
dant Wells Fargo Bank did illegally seize and convert the
home of Plaintiffs Rondell Muhammad and Sharon
Muhammad;

n.  Defendant **Ally Financial, Inc**., (formerly GMAC Mortgage,
Inc.) uses Defendant Codilis & Assocs. illegally to seize and
convert dozens of  homes each year using fraudulent docu-
ments and is under investigation by several States' attorneys
general and by the Office of the Comptroller of the Currency;
Defendant Ally Financial, Inc., did illegally seize and convert
the home of Plaintiffs James M. Ami and Sharon K. Ami;

o.   Defendant **Bank of America N.A.** uses Defendant Codilis &
Assocs. illegally to seize and convert dozens of homes each
year using fraudulent documents and is under investigation
by several States'  attorneys general and by the Office of the
Comptroller of the Currency; Defendant Bank of America
N.A. did attempt illegally to seize and convert the home of
Defendant Bettye Brown and did extort from her a sizeable
payment thereby;

p.  Defendant **PNC Bank N.A.** uses Defendant Codilis &
Assocs. illegally to seize and convert dozens of homes each
year using fraudulent documents and is under investigation
by several States' attorneys general and by the Office of the
Comptroller of the Currency; Defendant PNC Bank N.A. did
llegally seize and convert the home of Plaintiffs Mohsin M.
Dhanji and Wahida M. Dhanji;

q.  Defendant **U.S. Bank N. A.** uses Defendant Codilis & Assocs. illegally to seize and convert dozens of homes each year using fraudulent documents and is under investigation by several States' attorneys general and by the Office of the Comptroller of the Currency; Defendant U.S. Bank N.A. did illegally seize and convert the home of Plaintiff Donna R. Love.

r.  Defendant **HSBC Bank (USA) N.A.** uses Defendant Codilis & Assocs. illegally to seize and convert dozens of homes each year using fraudulent documents and is under investigation by several States' attorneys general and by the Office of the Comptroller of the Currency; Defendant HSBC Bank (USA) N.A. did illegally seize and convert the home of Plaintiff Exiquio Camacho.

For the addresses and telephone numbers of the Defendants, see the Service List below at pages 70-75.

## JURISDICTION AND VENUE

43.  All named Plaintiffs are residents of the Northern District of Illinois and, at all relevant times, are or were owners and mortgagors of their homes.

44.  In all of the acts alleged herein, during all relevant times, all of the Defendants in this case were doing business in the Northern District of Illinois, and all of the Defendants were also engaged in interstate commerce and transported in interstate commerce the proceeds of their scheme.

45.  This Court has jurisdiction over all of the parties to this case, and venue is proper in the Northern District of Illinois.

46.  The amount in controversy is more than $5 million.

47.   Congress has authorized jurisdiction in federal district courts "of all civil actions arising under the Constitution and laws of the United States."  28 U.S.C § 1331.

48.   Count I alleges wire fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, financial-institution fraud under 18 U.S.C. § 1344, interference with commerce and extortion under 18 U.S.C. §1951, racketeering under 18 U.S.C. § 1952, laundering of monetary instruments under 18 U.S.C. § 1956, and interstate transportation of stolen property under 18 U.S.C. §§ 2314 and 2315.   This Court has "federal question" subject-matter jurisdiction over Count I under 28 U.S.C. § 1331.

49.   Count II alleges conspiracy, unjust enrichment, and emotional distress.  This Court has supplemental jurisdiction over Count II under 28 U.S.C. § 1367.

50.   Count III alleges multiple violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., Title VII of the Consumer Credit Protection Act, which is a law of the United States.   This Court has "federal question" subject-matter jurisdiction over Count III under 28 U.S.C. § 1331.

51.   Count IV alleges multiple violations of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, over which this Court has "federal question" subject-matter jurisdiction under 28 U.S.C. § 1331.

52.   Count V seeks certification of a Class under Fed.R.Civ.Pro. 23 of parties injured by the acts alleged in Counts I through IV.

53.   Count VI alleges violations of R.I.C.O. ("Racketeer Influenced and Corrupt Organizations Act," 18 U.S.C. §§ 1961-1968).  This Court has "federal question" subject-matter jurisdiction under 28 U.S.C. § 1331.

54.   Count VII alleges conspiracy to violate R.I.C.O..  This Court has "federal question" subject-matter jurisdiction under 28 U.S.C. § 1331.

55.   Venue in the case at bar is proper because all parties either reside in the Northern District of Illinois or do business there, and the real-estate in question is located there.   All Defendants have consented to venue in the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

56.   There are eight ways in which Plaintiffs have been injured by Defendants' scheme:

a.   The homeowners' debts are not satisfied by a foreclosure by a straw-man plaintiff.  The victims' properties are taken, but the home-owners' debt represented by the mortgage Note, which is owned by a party other than one of the Defendants, is not satisfied.  Therefore, in each foreclosure without a Note or without chain-of-title, the home-owners are injured in amounts equal to the value of the unpaid debt.

b.   If the affected home is not taken, a foreclosure radically reduces the market value of the affected home, so the homeowners cannot refinance and are forced to sell at fire-sale prices and lose equity in their property.

c. Because the Defendants' actions have reduced radically the market value of the properties, the Defendants can obtain a large deficiency judgment (equal to the difference between the debt and the fire-sale value) against the homeowners personally, which they otherwise would not be able to do.

d. The homeowners are compelled to pay large sums to defend against the unlawful foreclosures.

e. The credit of homeowners whose homes are illegally seized and converted is ruined, so their ability to buy other property in the future is reduced and the cost of doing so is sharply increased.

f. The value of the properties adjacent to the Plaintiffs' homes has been dragged down by the foreclosure process, so the Defendants have committed waste.

g. Homeowners in foreclosure cases cannot sell their homes and move to where better jobs are available because Defendants' actions have put their properties "under water."

h. The homeowners are forcibly evicted (unlawfully to pay an unse-cured debt). All of the above cause extreme emotional stress to the homeowners' families and can break up those families, adding long-term social costs.

57. All of the injuries to Plaintiffs complained of herein occurred independently of (and prior to) the judgments of the defrauded State foreclosure court that Defendants used to convert the Plaintiffs' properties and were

caused solely by the acts of the Defendants. None of the Plaintiffs is asking for recovery of his home, none of the Plaintiffs could have raised issues of collateral damage (for example attorneys' fees, damaged credit, cost of moving, and emotional harm) in the State-court proceedings, and in all cases the State-court proceedings failed to either address or remedy Plaintiffs' injuries.

58. The junior mortgagees are injured because the Defendants, who hold bifurcated first mortgages, foreclose improperly, inflate the amount due under the first mortgages, and manipulate the market so as to wipe out junior mortgage liens. Buyers who purchase the affected properties after Defendants evict the owners are injured because there is a cloud on their title of which they were unaware. The true owners of the homes that Defendants illegal seized and converted may legally regain possession of their homes.

59. The federal and State courts are injured by the Defendants' scheme. The State courts are so overwhelmed with mortgage-foreclosure cases that they are unable to control the Defendant law firms, unable to enforce the law, and unable to prevent large-scale fraud on themselves. Defendants' scheme in all of its parts constitutes conversion (on the Plaintiffs) and fraud (on the courts).

60. Among all the parties that are harmed by the Defendants' scheme, the title companies may be harmed the most (after the evicted families). Title companies are harmed because they have legal exposure for

the clouds on title caused by the Defendants' scheme if the true owners of the illegally seized and converted homes ever return.

61.  Therefore, on Friday, October 1, 2010, Old Republic National Title Insurance, a major title-insurance company based in Minneapolis, announced to all of its agents:

> The Company will not insure title to any property which has been foreclosed by Ally Financial, Ally Bank or GMAC [or J.P. Morgan-Chase] until further notice.

Fidelity National Financial, Inc., another major title-insurance company, followed suit the same day.  Since all of the Defendants are involved in the same scheme, the title companies soon will be taking the same action with regard to the other Defendants.  This will cause the price of foreclosed properties to plummet farther, because lenders will not issue a new mortgage without title insurance.

62.  In sum, millions of homeowners and junior mortgagors certainly are being charged the wrong amounts.  And millions more are losing their homes, losing the equity in their homes, and losing their ability to repay their loans---because their credit is ruined by illegal seizures of their principal asset.  Meanwhile, the (illegal) foreclosures put downward pressure on real-estate values, which prevents refinancing, which causes more (illegal) foreclosures, which decrease property-tax revenues, which raises taxes, which causes more (illegal) foreclosures.  (See Plaintiff's Exhibit "**Y**," Yves Smith,

"How the Banks Put the Economy Underwater," <u>The New York Times</u>, 30 October 2010.)

63.  The reason the Defendants are engaged in this scheme is that, by law, the mortgage Note and the mortgage must remain together with proper assignments in a "chain of title" for a debt to be a secured debt.  Instead, the Defendants set up mortgage-securitization trusts ("the Trusts") that are elaborately crafted to have the tax-free status of "Real Estate Mortgage Investment Conduits" ("REMIC's") under the I.R.S. Code, then sold their mortgage Notes to these Trusts, and the Trusts in turn sold to investors "Mortgage Pass-Through Certificates" or "Asset-Backed Certificates" (collectively, the "Certificates") that entitle the holders to receive Plaintiffs' monthly payments.  These Certificates are Mortgage Backed Securities ("MBS's"), and the banks, through their Trusts, have sold to investors approximately $8 trillion of these Certificates (tens of trillions if credit-default swaps on them are included).   The servicing rights were also sold off.

64.  However, upon information and belief, the mortgage Notes were never assigned to the Trusts that purchased them, for three reasons: (a) To do so would invite audits by the investors of the quality of the mortgages, and they are of much lower quality than what the banks represented to the investors.   (See Complaint in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 08 Civ 10783 [S.D. N.Y.].)  (b) To do so would prevent the banks from selling the same mortgage Notes to multiple REMIC's at the same time.  (See Plaintiffs' Exhibit "**Z**," Yves Smith, "How Did the Banks Get

Away with Pledging Mortgages to Multiple Buyers?," *Naked Capitalism*, 26 October 2010, republished on Plaintiffs' website, www.TheForeclosureFraud.om, p. 3.) And, (c) to do so would threaten the tax-exempt status of the REMIC's.

65. Mortgage Notes are negotiable instruments under the Uniform Commercial Code and can be enforced only by a "holder" of the mortgage Note. The banks are not holders of the Notes because they sold them to the Trusts. The Trusts are not holders of the Notes because they never were assigned to the Trusts. The certificateholders are not holders of the Notes because all they hold are Certificates. And the banks' servicing agents, like Defendant Select Portfolio Servicing, Inc., are just the bank's accountants, bill collectors, and attorneys, who own no interest at all in the mortgage Notes. Once this happens, when no party is the "holder" of the Note, the mortgage is said to be "bifurcated" (the ownership of the debt and the right to foreclose to enforce it are split into two separate parts), and the affected loans become unsecured debt. The Trusts, which have purchased the right to collect the debts, can sue the homeowners in equity for the amount they actually paid for the paper, but they do not have a right to take the collateral. This is the legal "price" the banks paid for tax-free status for their REMIC's, for $8 trillion in certificate sales, and for secrecy.

66. However, the banks did not want to accept this legal result. If the MBS's were unsecured, the banks could not sell them for such high prices to investors. (And a bank must sell the mortgages, because one cannot earn

much profit lending money at 5.0% simple interest and then paying salaries and losing money on defaults and lawsuits.) So the banks decided that they would not follow the law. First, upon information and belief, the banks sold the mortgage Notes to more than one Trust at the same time. Then the banks represented to the certificateholders, in the Trusts' Master Pool Servicing Agreements ("PSA's) and in the Registration Statements that the banks filed with the Securities and Exchange Commission for the purpose of selling the Certificates, that the mortgage Notes owned by the Trusts were fully secured and that the banks would assign them to the Trust. (See Plaintiffs' Exhibit "**AA**," a typical PSA.) They were not, and the banks did not do so. Upon information and belief, they did not do so because the scheme alleged in this Amended Complaint depends upon secrecy. (See Plaintiff's Exhibit "**BB**," Karl Denninger, "See, I Told You So [Mass Document Forgery?]," *The Market Ticker*, 3 October 2010). Then, when defaults occurred, the banks foreclosed (illegally) on the mortgages and took the collateral without holding the Notes and without telling the investors, while continuing to pay the investors so that the investors could not sue. This way, the banks are paid multiple times for each loan: once when they sell it to the investors in the first REMIC, probably a second time when they sell it to the investors in a second REMIC, and a third time when they foreclose on the collateral and take it. This provides to the banks, so far, sufficient funds to continue making payments to the investors, as they have done. Upon information and belief, the scheme is essentially an elaborate Ponzi scheme.

67.   It is precisely to prevent this sort of scheme that the knowing drafters of the U.C.C. retained the old-fashioned requirement that a negotiable instrument may be enforced only by its "holder" and only if that holder has an uninterrupted chain of title to the instrument.

68.   In addition, since the banks all share the same risk and the same need, the banks formed an association-in-fact and purchased servicing companies to act as their agents and to distance themselves from the actions of their agents.   (In the case of the Stones, the servicing agent was Defendant Select Portfolio Servicing, Inc., a wholly owned subsidiary of Defendant Credit Suisse, like the straw-man plaintiff it used to sue the Stones.)   These servicing agents collect Plaintiffs' monthly mortgage payments and divide them among their client banks.   Also, the servicing companies and their owners, the banks, have a portfolio of corporations which they designate as straw-man plaintiffs in the foreclosure cases.   Upon information and belief, the choice of plaintiff in each foreclosure case is made not with regard to who owns the Notes, because none of the banks own the Notes, but rather with regard to which bank has contributed the most into the association-in-fact, according to which bank needs to avoid tax liability, and according to which bank needs to avoid legal liability.   After all, if none of the member banks owns the Note, and if all the banks have already been paid in full, it is essentially arbitrary who gets the profit from any given foreclosure.   In other words, the entities that foreclose on homeowners'

mortgages usually are "straw man" plaintiffs that have no legal interest in the Notes or in the collateral.

69.   This massive fraud on the courts requires forged documents.  So the Defendants' association-in-fact, often through its servicing agents, including Defendant Select Portfolio Servicing, hired law firms with less-than-sterling reputations, such as Defendant Codilis & Associates and the Law Office of David J. Stern, the "Florida foreclosure king."  (See Plaintiffs' Exhibit "**CC**," Nick Timiraos, "Fannie, Freddie Cut Ties to Law Firm," *The Wall Street Journal,* 3 November 2010, and Lynn E. Szymoniak, "The Most Reviled Law Firm in Florida and the 'Unowned Mortgage Loans' Scheme," *Fraud Digest*, republished at www.TheForeclosureFraud, p. 3.)

70.   In the case of the Plaintiffs (except Rondell and Sharon Muhammad) Defendants hired Defendant Codilis & Assocs. of Burr Ridge, Illinois to file the fraudulent documents.  In the case of the Muhammads, the Defendants hired Defendant Kluever & Platt LLC.  These firms in turn used temporary "Robo-Signer" companies such as DocX and Fidelity National Foreclosure that simply fabricate entire foreclosure files (for $95 a file) and forge the necessary summary-judgment affidavits ($12.50 a case).  The affidavits are supposed to prove to the court that there is no genuine issue of material fact and are supposed to be made under oath, stating that the affiant has the file in hand, including records of all payments, and has personally calculated the correct amount due.  Instead the "Robo-Signer" companies manufacture the files, and then each "Robo-Signer" signs up to

18,000 forged "affidavits" each month. (See Affidavit of Jeffrey Stephan, 10 December 2009, in *GMAC v. Neu*, Case No. 50 2008 CA 040805xxxx MB [Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida] and Plaintiffs' Exhibit "**V**," Lynn E. Szymoniak, "Highlights from a Deposition of Jeffrey Stephan," *Fraud Digest* [18 July 2010], republished at www.TheForeclosureFraud.com, p. 6). It appears from the documents they sign that the "Robo-Signers" not only do not have any knowledge of the correct amount due from the homeowners but also do not know which straw-man is the plaintiff in any given case. (See Plaintiffs' Exhibit "**DD**," Ariana Eunjung Cha, "Foreclosure Processors Face Criminal Probes," *Washington Post*, 1 November 2010.)

71. The Robo-Signer companies used by the Defendants are not strangers to controversy. One such company used by Defendant Portfolio Servicing is DocX. DoxX advertises its services on the internet:

> DOCX's GetNet™ Document Recovery solution is a national network . . . that is engaged to provide document recovery. The service is unique in that our clients can request that DOCX obtain any missing recordable documents . . . .
>
> GetNet™ was designed to assist mortgage servicers in meeting agency certifications and to avoid costly penalties for filing late satisfaction pieces.
>
> GetNet™ Features:
>
> • Obtains missing mortgage documents, assignments, title policies and LGC/MICs.
>
> *GetNet™ Rate Sheet:* . . .
>
> S102  Cure Defective Mortgage . . . . . . . . . . . . . . $12.95 + TPC

```
TP02 Correct Existing Title Policy . . . . . . . . . . . .   19.95 + TPC
LN02 Create Lost Note Affidavit . . . . . . . . . . . . . .   12.95 + SH
NA01 Create Note Allonge . . . . . . . . . . . . . . . . . .   12.95 + SH
IA01 Obtain Copy of Assignment . . . . . . . . . . .   15.95 + TPC
1A02 Retrieve Certified Copies of Assignments .. $15.95 + TPC
1A03 Create Missing Intervening Assignment .. $35.00 + TPC
IA05 Cure Defective Assignment . . . . . . . . . . . . . $12.95 + TPC
```
**CF01  Recreate Entire Collateral File . . . . . . . . $95.00 + TPC**
[emphasis added]
Contact DocX Support at 800/723-0215 Ext. 3014 or e-mail support@
docx.com

72.   Beginning on December 10, 2009, the so-called "Robo-Signers"
scandal began to unfold nationwide.   On that date, in the "Deposition of
Jeffrey Stephan" in *GMAC Mortgage, LLC, v. Neu* (Circuit Court of the
Fifteenth Judicial Circuit, Palm Beach County, Florida, Case No. 50 2008 CA
040805 MB, republished at www.TheForeclosureFraud.com, p. 6), Mr.
Stephan, a professional document signer used by Defendant GMAC, admitted
that he signed 8,000 to 12,000 (necessarily false) documents in foreclosure
cases each month. (See Plaintiff's Exhibit "**V**," Lynn E. Szymoniak, "High-
lights from a Deposition of Jeffrey Stephan," *Fraud Digest*, republished at
www.TheForeclosureFraud.com, p. 6.)

73.   Then, on May 18, 2010, in the "Deposition of Beth Ann Cottrell" in
*Chase Home Finance, LLC, v. Fleming* (Circuit Court of the Fifteenth Judicial
District, Palm Beach County, Florida, Case No. 50-2009-CA-026599), Ms.
Cottrell, a professional document-signer used by Defendant JP Morgan-
Chase, admitted in a deposition to signing off on about 18,000 (necessarily
false) documents each month in mortgage-foreclosure cases for Defendant
J.P. Morgan-Chase, admitted that she falsely stated in affidavits that she

was an employee of Chase, and testified that she was one of eight signers who did the same. Then Ms. Linda Green, another "Robo-Signer" employed by DocX/Lender Processing Services in Alpharetta, Georgia, admitted that she had sworn under oath in one court document that she was a Vice President of Defendant Wells Fargo Bank; sworn in another court document that she was an executive of Defendant Bank of America; sworn in another court document that she was a Vice President of Mortgage Electronic Registration Systems; sworn in another court document that she was a Vice President of Option One Mortgage Corporation; sworn in another court document that she was a Vice President of American Home Mortgage Servicing, Inc.; sworn in another document that she was a Vice President of Argent Mortgage Company, LLC; sworn in another document that she was a Vice President of Sand Canyon Corporation; sworn in another document that she was a Vice President of Seattle Mortgage Company; and likewise swore that she was an employee of other lenders, while signing off on fake documents in tens of thousands of mortgage-foreclosure cases. Likewise, in seven different cases "she" has seven quite different signatures. (See Plaintiffs' Exhibit "**EE**," "Review Pleadings," *Fraud Digest,* republished at www.TheForeclosureFraud.com, p. 6.)

74. Ms. Green got the attention of the press. On Thursday, September 23, 2010, the *Washington Post* broke the "Robo-Signers" scandal with a front-page article. The attention of the national press and of financial analysts to the Robo-Signer scandal and the Mortgage Morass since that date is compiled at www.TheForeclosureFraud.com, p. 3.

75. On Friday, September 24, 2010, the court in *Fannie Mae v. Bradbury* (Bridgton District Court, Cumberland County, No. BRI-RE-09-65) (Powers, J.), ordered Fannie Mae to pay attorney's fees of the borrower because of Defendant GMAC's persistent and "flagrant disregard" for the law:

> The Court is particularly troubled by the fact that Stephan's deposition in this case is not the first time that GMAC's high-volume and careless approach to affidavit signing has been exposed. Stephan himself was deposed six months earlier, on December 10, 2009, in Florida. His Florida testimony is consistent with the testimony given in this case: except for some limited checking of figures, he signs summary judgment affidavits without first reading them and without appearing before a notary. Even more troubling, in addition to that Florida action, in May, 2006 another Florida court not only admonished GMAC, it sanctioned the Plaintiff lender for GMAC's affidavit-signing practices. As part of its order, the Florida court required GMAC to file a Notice of Compliance, indicating its commitment to modify its affidavit signing procedures to conform to proper practices. The experience of this case reveals that, despite the Florida Court's order, GMAC's flagrant disregard apparently persists. It is well past time for such practices to end.

The court then held that the affidavit of foreclosure "was submitted in bad faith."

76. On September 24, 2010, the Attorney General of Ohio, questioning whether Defendants were violating State laws with the foreclosure practices, asked all foreclosure courts in that State to review all foreclosure cases involving Defendant Ally Financial Inc. [GMAC Mortgage], which participates in the Defendants' scheme. (See Plaintiffs' Exhibit "**FF**.")

77.   Later that same day, Defendant J.P. Morgan-Chase, which participates in the Defendants' scheme, joined Defendant GMAC Mortgage in suspending indefinitely 56,000 of its mortgage-foreclosure cases in all 23 States that have judicially supervised foreclosures.

78.   On Friday, October 1, 2010, Defendant Bank of America joined Defendants J.P. Morgan-Chase and Defendant GMAC Mortgage in suspending indefinitely all of its mortgage-foreclosure cases in all 23 States that have judicially supervised foreclosures.

79.   That same day, the Attorney General of California (which has non-judicial foreclosures) ordered Defendant J.P. Morgan-Chase to halt all foreclosures in that State until it proves it complies with the law.  He issued a similar directive to Defendant GMAC last week, and he has said in a public e-mail statement that both lenders have admitted that their scheme is "a ruse."

80.  That same day, the Attorney General of Connecticut opened a probe into the foreclosure practices of Defendant J.P. Morgan-Chase and asked that State's Judicial Department to freeze all home foreclosures for 60 days, citing reports on Defendants GMAC and J.P. Morgan-Chase.  (See Plaintiffs' Exhibit "**GG.**")

81.   On October 5, 2010, the Attorney General of Texas called for a halt on foreclosures.  (See Plaintiff's Exhibit "**HH**," Office of the Attorney General of Texas, republished at www.TheForeclosureFraud.com, page 2.)

82. On October 7, 2010, the Attorney General of Iowa requested all mortgage companies to halt foreclosures in Iowa. (See Plaintiff's Exhibit "**II**," Office of the Attorney General of Iowa, republished at www.TheFore-closureFraud.com, page 2.)

83. On October 13, 2010, the National Association of Attorneys General issued a joint statement of all 50 Attorneys General investigating the foreclosure practices of the Defendants. (See Plaintiffs' Exhibit "**JJ**.")

84. On November 7, 2010, Joseph E. Stiglitz, Professor at Columbia University, recipient of the Nobel Memorial Prize in Economic Sciences, and former chief economist of the World Bank, published "One Law for the Rich, One Law for the Poor: the New Foreclosure Crisis Reveals the Shocking Unfairness in How the Law Treats Struggling Homeowners," in *Slate*. (See Plaintiffs' Exhibit "**KK**," republished at www.TheForeClosureFraud.com. Professor Stiglitz writes about the reaction of the courts so far to Defendants' scheme:

> The Mortgage debacle in the United States has raised deep questions about "the rule of law," the universally accepted hallmark of an advanced, civilized society. The rule of law is supposed to protect the weak against the strong, and ensure that everyone is treated fairly. In America in the wake of the subprime mortgage crisis, it has done neither.

85. Defendant Codilis & Assocs. is no stranger to controversy. This Court has certified a class-action lawsuit against Codilis & Assocs. for alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692(g) in

*Shea v. Codilis*, 99 C 0057. Also, in *Bassman v. Codilis & Assocs. et al.,* 09 C 7914 (2010), Codilis & Assocs. settled claims alleging that it brought mortgage-foreclosure cases improperly in violation of the Illinois Mortgage Foreclosure Law.

86. Defendant Select Portfolio Services, Inc., likewise is no stranger to deceptive practices. An article posted on the official website of the Federal Trade Commission states that in November of 2003, Fairbanks Capital Corp. agreed to pay $40 million to settle with the FTC and the U.S. Department of Housing and Urban Development, which had charged them with engaging in "a number of unfair, deceptive, and illegal practices in the servicing of subprime mortgage loans." The article continues: "In early 2004, the defendants changed their names to Select Portfolio Servicing, Inc."

87. On April 23, 2008, Reuters reported that a high-level Credit Suisse banker and a number of his employees in Credit Suisse subsidiary Clariden were arrested in Brazil and "charged with money laundering, tax evasion, fraudulent banking and operating without a banking license, among other things."

88. Defendant Credit Suisse is no stranger to hiding identities and to organizing tax evasion. The New York Times reported on December 16, 2009, that Manhattan District Attorney Robert Morganthau, the Justice Department and Federal Reserve had reached an agreement with Credit Suisse in which Credit Suisse was fined $536 million. Credit Suisse settled on charges that it violated sanctions regulating financial transactions with Iran. The

charges included "stripping", the practice of removing the identity and origin of funds used in transactions. Credit Suisse stripped the identities of Iranian banks enabling funds to be transferred to the Atomic Energy Organization of Iran and the Aerospace Industries Organization, entities respectively involved in the production of nuclear weapons and long range missiles. Employees of Credit Suisse advised Iranian banks such as Bank Melli and Bank Saderat on methods to hide their identities and send more than a billion dollars through New York banks.

89. Defendants' actions in illegally seizing and converting Plaintiffs' homes were knowing, malicious, intentional, willful and wanton, fraudulent, and have been aggravated by outrageous circumstances of oppression on the part of the Defendants.

## COUNT I: FRAUD, EXTORTION, RACKETEERING, MONEY LAUNDERING, TRANSPROTATION AND RECEIPT OF STOLEN GOODS

90. The Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

91. The Plaintiffs assert these claims on behalf of themselves and others similarly situated who have been injured by the Defendants' conduct as set forth herein.

92. Defendant Banks, their servicing agents, and their document-forging companies are financial institutions.

93. The actions of Defendant financial institutions meet all of the elements of fraud, including justifiable reliance by the courts and the

Plaintiffs who paid the Defendants, on the Defendants' false statements knowingly and intentionally made for the purpose of deceiving the courts and the Plaintiffs to their detriment.

94.   The Defendants have intentionally and knowingly submitted false pleadings and have caused the courts to rely upon those false pleadings, to the detriment of the Plaintiffs, to the detriment of the Class, and to the detriment of the Courts.   The Defendants have intentionally and knowingly induced the Plaintiffs to accept mortgages based on false appraisals.

95.   Mail Fraud.  The Defendants have devised or intended to devise a scheme or artifice to defraud, for obtaining money and property by means of false or fraudulent pretenses, representations, or promises.  And, for the purpose of executing such scheme or artifice, or attempting so to do, the Defendants have placed into the United States mail things to be sent or delivered by the Postal Service.  These actions are prohibited by 18 U.S.C. § 1341.

96.   Wire Fraud.  The Defendants have devised or intended to devise a scheme or artifice to defraud, for obtaining money and property by means of false or fraudulent pretenses, representations, or promises, and have transmitted or caused to be transmitted by means of wire in interstate commerce, writings and sounds for the purpose of executing such scheme or artifice.  These actions are prohibited by 18 U.S.C. § 1343.

97.   Bank Fraud.   The Defendants have knowingly executed or attempted to execute a scheme or artifice to defraud financial institutions (the holders of junior mortgages) and to obtain moneys, funds, credits, assets, securities, or other property owned by a financial institution, by means of false or fraudulent pretenses, presentations, or promises.  Such actions are prohibited by 18 U.S.C. § 1344.

98.  Extortion. The Defendants have obstructed, delayed, or affected commerce by means of extortion or attempts or conspiracies so to do, by obtaining property from others, with their consent, induced under color of official right.  Such actions are prohibited by 18 U.S.C. § 1951.

99.  Racketeering.  The Defendants have traveled in interstate commerce and used the mail in interstate commerce, with intent to distribute the proceeds of extortion, and have otherwise promoted, managed, established, carried on, and facilitated the promotion, management, establishment, and carrying on of unlawful activity.  Such actions are prohibited by 18 U.S.C. § 1952.

100.  Money Laundering.  The Defendants, knowing that the property involved in their financial transactions alleged herein represented the proceeds of unlawful activity, conducted or attempted to conduct such financial transactions involving the proceeds of unlawful activity, with the intent to promote the carrying on of unlawful activity.  Also, the Defendants did so to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of such unlawful activity, and to avoid a transaction reporting requirements under State and Federal law. Such actions are prohibited by 18 U.S.C. § 1956.

101.  Transportation of Stolen Goods.  The Defendants transported, transmitted, and transferred in interstate commerce securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted, or taken by fraud.   Such actions are prohibited by 18 U.S.C. § 2314.

102.  Receipt of Stolen Goods.  The Defendants have received, possessed, concealed, stored, sold, or disposed of securities and money, of the value of $5,000 or more, which have crossed a State boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen,

unlawfully converted, or taken. Such actions are prohibited by 18 U.S.C. § 2315.

103. Upon information and belief, one of the purposes of the Defendants' scheme is to evade payment of taxes, to the detriment of the States and to the detriment of the United States.

104. The Defendants used these false pleadings to attempt to take the Plaintiffs' homes in the names of straw-man plaintiffs that have no recorded interest in the homes, for their own profit and to the detriment of the Plaintiffs.

105. In every case where a property has been foreclosed using a bifurcated mortgage and a straw-man plaintiff, and without support for the plaintiff's claim in the records of the county recorder of deeds, the homeowners, the courts, the States, and the United States of America have been injured.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A. An Order requiring Defendants to pay damages to Plaintiffs in an amount equal to the injuries caused to Plaintiffs by Defendants' scheme, in an amount to be determined at trial;

B. A temporary restraining order and a preliminary injunction temporarily enjoining the Defendants from foreclosing and selling the properties of the named Plaintiffs and the Class members pending the resolution of this case;

C.   An Order permanently enjoining the Conspirators, jointly and severally, from future foreclosures with broken chains of title, using straw-man plaintiffs and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

## COUNT II: CONSPIRACY, UNJUST ENRICHMENT, AND EMOTIONAL DISTRESS

106.   The Plaintiffs re-allege and incorporate by reference all preceding pararaphs as if fully set forth herein.

107.   The Plaintiffs assert these claims on behalf of themselves and others similarly situated who have been injured by the Defendants' conduct as set forth herein.

108.   The Defendants' scheme alleged herein constitutes unjust enrich-ment.

109.   The Defendants' scheme alleged herein intentionally caused emotional distress to the Plaintiffs.

110.   The Defendants combined and conspired with one another to form an association-in-fact to commit the acts alleged herein.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A.   An Order requiring Defendants to pay damages to Plaintiffs in an amount equal to the injuries caused to Plaintiffs by Defendants' scheme, in an amount to be determined at trial;

B.   A temporary restraining order and a preliminary injunction temporarily enjoining the Defendants from foreclosing and selling the properties of the named Plaintiffs and the Class members pending the resolution of this case;

C.   An Order permanently enjoining the Conspirators, jointly and severally, from future foreclosures with broken chains of title, using straw-man plaintiffs and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

D.   Where permitted by law, an award of restitution and disgorgement to each Class member, to remedy Conspirators' unjust enrichment, in an amount to be determined at trial; and

E.   An award of damages to Plaintiffs sufficient to compensate them for Defendants' intentional infliction of emotional distress, in an amount to be determined at trial;

## COUNT III:  VIOLATION OF THE FDCPA

111.    The Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

112.  The Plaintiffs assert these claims on behalf of themselves and others similarly situated who have been injured by the Defendants' conduct as set forth herein.

113.  Defendant DLJ Mortgage Capital, Inc., claims to have bought the Stones' mortgage Note and therefore is a debt collector under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*

114. Defendants Select Portfolio, Inc.; Ernest J. Codilis, Jr.; Codilis & Assocs.; and Jason D. Altman are attorneys for debt buyers and and are attempting to collect debt and therefore are debt collectors under the FDCPA.

115. The Defendants have intentionally submitted false pleadings in mortgage-foreclosure cases before State and federal courts nationwide and have caused the courts to rely upon those false pleadings--- to the detriment of the courts, to the detriment of the Plaintiffs, to the detriment of foreclosed second mortgagees, to the detriment of affected title companies, and to the detriment of subsequent buyers of the properties.

116. The Defendants are attempting to use these false pleadings to collect unlawful debts by taking the Plaintiffs' homes in the name of purported clients that have no interest in the collateral, for their own profit and to the detriment of Plaintiffs.

117. Defendant Codilis & Assocs. is a "foreclosure mill" that processes thousands of cases through the Circuit Courts of Illinois each year, using the same racketeering scheme used against Plaintiffs as alleged above in this action.

118. The Defendants' intentionally and knowingly filing of false documents in the Circuit Court of Cook County constitutes "seeking unjustified amounts," a practice forbidden under the FDCPA.

119. The Defendants' fraudulent pleadings in federal courts and in State courts constitute "misrepresentation and deceit" under the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A.  An award of $1,000 under the FDCPA to each Class member in addition to actual damages;


## COUNT IV: DEPRIVATION OF RIGHTS


120.  The Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

121.  The Plaintiffs bring this action on behalf of themselves and all others similarly situated who have been injured the Defendants' scheme, as a class action pursuant to Fed.R.Civ.P. Rule 23.

122.  The Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, provides in pertinent part:

> <u>Civil Action for Deprivation of Rights</u>.
> Every person who, under color of any statute, ordinance, regu-
> lation, custom, or usage, of any State or Territory or the District
> of Columbia, subjects, or causes to be subjected, any citizen of
> the United States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or immunities secured
> by the Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper proceeding for
> redress . . . .

123.  Property is a privilege or immunity secured by the Constitution and laws.

124.  Defendants' seizing and converting of Plaintiffs' property deprived them of their right to property without Due Process and Equal Protection of the laws.

125. The purposes of the Ku Klux Klan Act include: (1) to provide a federal remedy where State law is inadequate, and (2) to provide a federal remedy where the State remedy, though adequate in theory, was not available in practice.

126. None of the Plaintiffs could have raised issues of collateral damage (for example attorneys' fees, damaged credit, cost of moving, and emotional harm) in the State-court proceedings, and in all cases the State-court proceedings failed to either address or remedy Plaintiffs' injuries. Therefore, the State law was inadequate, and the State remedy, though adequate in theory, was not available in practice.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A. An Order requiring Defendants to pay damages to Plaintiffs in an amount equal to the injuries caused to Plaintiffs by Defendants' scheme, in an amount to be determined at trial;

B. A temporary restraining order and a preliminary injunction temporarily enjoining the Defendants from foreclosing and selling the properties of the named Plaintiffs and the Class members pending the resolution of this case;

C. An Order permanently enjoining the Conspirators, jointly and severally, from future foreclosures with broken chains of title, using straw-man plaintiffs and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

D.   Where permitted by law, an award of restitution and disgorgement to each Class member, to remedy Conspirators' unjust enrichment, in an amount to be determined at trial.

## COUNT V:  CLASS ACTION

127.  The Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

128.  The Plaintiffs bring this action on behalf of themselves and all others similarly situated, who have been injured by Defendants' scheme, as a class action pursuant to Fed.R.Civ.P. Rule 23.

129. Defendants process thousands of fraudulent cases through the State courts each year, using the same methods they used against the Plaintiffs as alleged in this Amended Verified Complaint.

130.  The Class is defined as follows:

**All present and former owners of residents whose homes are being, or have been, the subject of a foreclosure suit by the Defendants using securitized, bifurcated mortgages or broken chains of title during the two years before the filing of this action (the "Class Period").**

131.   The members of the Class are so numerous that joinder of all members would be neither feasible nor practical.  While the size of the Class is unknown to the Plaintiffs at this time, it is estimated that the entire class is greater than 100,000 individuals.  The disposition of the Class members' claims in a class action will provide substantial benefit to the parties and to this Court.

132.   The named Plaintiffs' claims are typical of the claims of the Class, and the named Plaintiffs have no interests adverse to the interests of other members of the Class.

133.   The Defendants include numerous persons acting as one association-in-fact.   Without a class action, the list of defendants named by each of the tens of thousands of plaintiffs would be different in each case, so the legal effect of tens of thousands of cases would be unclear.

134.   This dispute raises questions of law and fact that are common to all Class members and that predominate over questions that arise on an individual basis for Class members.   The common questions of law and fact include, without limitation, the following:

a.   In all mortgage-foreclosure cases brought by the Defendants during the Class Period, did the Defendants offer proof that they had an interest in the foreclosed properties by attaching to their complaint a copy of the mortgage and the mortgage Note, with the mortgage Note properly assigned to its REMIC real-estate investment Trust and showing no breaks in the chain of title?

b.   If not, what was the extent of injuries suffered by the Class, and what is the appropriate amount of compensation?

c.   Did the Defendants act with malice, oppression, and fraud so as to justify an award of punitive and exemplary damages?

d.   Is the Class entitled to injunctive relief, and, if so, what is the proper nature and duration of that relief?

135.   The named Plaintiffs, as representative parties, will fairly and adequately protect the interests of the Class.

136.   One of the attorneys for the named Plaintiffs has many years of experience with class actions and is experienced and competent in the prosecution of complex class-action litigation.

137.   The nature of this action and the nature of the laws available to the Class make use of the class-action format a particularly efficient and appropriate procedure to afford relief to the Class.  Further, this case involves, on the one hand, a small number of business-entity Defendants confederated into an association-in-fact and, on the other hand, a large number of unsophisticated individual Class members possessing claims with common issues of law and fact.  If each Class member were required to file an individual lawsuit, the business-entity Defendants would necessarily gain an unconscionable advantage with their vastly superior financial and legal resources, which they would be able to exploit and overwhelm the limited resources of each individual plaintiff.  Proof of common business practices or factual patterns, which the named Plaintiffs experienced, will establish the right of each of the members of the class to recovery on the claims alleged herein.

138.   Prosecution of separate lawsuits by the individual Class members, even if it were possible (which it is not), would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with respect to the individual class members against the Defendants herein; and

(b) legal determinations with respect to individual Class members not parties to the adjudications or which would substantially impair or impede the ability of class members to protect their interests. Because all of the Defendants' actions are in the public records, Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action. The Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A. An Order certifying this action as a class action and appointing counsel to represent the Class;

## COUNT VI: RICO

139. The Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

140. The Plaintiffs bring this action on behalf of themselves and all other similarly situated as a class action pursuant to Fed.R.Civ.P. Rule 23.

141. The United States' R.I.C.O. statute provides, in relevant part, as follows:

§ 1961. Definitions:

"(1) '[R]acketeering activity' means . . . any act which is indictable under any of the provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud),

- 60 -

section 1343 (relating to wire fraud), section 1344
(relating to financial institution fraud) . . . section
1951 (relating to interference with commerce or extor-
tion), section 1952 (relating to racketeering), . . .
section 1956 (relating to the laundering of monetary
instruments) . . . , [and] sections 2314 and 2315 (relat-
ing to interstate transportation of stolen property) . . . .

§ 1962.  Prohibited Conduct:

"(a)  It shall be unlawful for any person who has received
any income derived . . . from a pattern of racketeering
activity or through collection of an unlawful debt in
which such person has participated as a principal . . .
to use or invest . . . any part of such income . . . in
acquisition of any interest in, or the establishment
or operation of, any enterprise which is engaged in  . . .
commerce.

"(b)  It shall be unlawful for any person through a pat-
tern of racketeering activity or through collection of
an unlawful debt to acquire or maintain . . . any
interest in or control of any enterprise which is
engaged in . . .  commerce.

"(c)  It shall be unlawful for any person employed by or
associated with any enterprise engaged in . . . commerce,
to conduct or participate . . . in the conduct of such
enterprise's affairs through a pattern of racketeering
activity or collection of unlawful debt."

"(d)  It shall be unlawful for any person to conspire to
violate any of the provisions of subsection (a), (b), or (c)
of this section."

§ 1964.  Civil Remedies: . . .

"(c) Any person injured in his business or property
by reason of a violation of § 1962 of this chapter may
sue therefor in any appropriate United States dis-
trict court and shall recover threefold the damages
he sustains and the cost of the suit, including a rea-
sonable attorney's fee . . . ."

142. At all relevant times, each of the Plaintiffs was a "person" for the purposes of the R.I.C.O. Act, 18 U.S.C. § 1964(c).

143. At all relevant times, each of the Defendants was a "person" for the purposes of the R.I.C.O. Act, 18 U.S.C. § 1962.

144. At all relevant times, all of the Defendants formed an association-in-fact for the purpose of bifurcating mortgages, selling them off, and then filing fraudulent mortgage foreclosures intended to conceal the bifurcations. This association-in-fact is an "enterprise" within the meaning of R.I.C.O., 18 U.S.C. § 1961(4) and § 1962.

145. At all relevant times, all of the Defendants were engaged in, and their activities affected, interstate and foreign commerce, within the meaning of R.I.C.O., 18 U.S.C. § 1962.

146. At all relevant times, all of the Defendants were engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above, including collection of unlawful debts. The acts set forth above constitute a violation of one or more of the following sections of 18 U.S.C.: section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1951 (relating to interference with commerce or extortion), section 1952 (relating to racketeering), section 1956 (relating to the laundering of monetary instruments), and sections 2314 and 2315 (relating to interstate transportation of stolen property).

147.   The acts alleged were related to each other by virtue of common participants, common victims (the courts, the homeowners, the junior mortgagees, the buyers of foreclosed homes, and the title companies), a common method of commission, and the common purpose and common result of defrauding the victims, including all fifty States and the United States of America, and enriching the Defendants at the expense of the victims.  Upon information and belief, the fraudulent scheme has continued for the past ten years and threatens to continue longer.

148.   The Defendants each committed and/or aided and abetted the commission of tens of thousands of acts of racketeering activity in a dense pattern over a period of ten years.

149.   At all relevant times, the Defendants received income derived from a pattern of racketeering activity or through collection of unlawful debts in which the Defendants participated as principals and used part of this unlawful income to acquire an interest in, and to establish or operate the association-in-fact, which is engaged in interstate commerce, and to control that enterprise. These acts are prohibited by the R.I.C.O. Act, 18 U.S.C. § 1962(a).

150.   At all relevant times, the Defendants, through a pattern of racketeering activity and through collection of unlawful debts, acquired or maintained an interest in or control of the association-in-fact, which is an enterprise engaged in interstate commerce.  These acts are are prohibited by the R.I.C.O. Act, 18 U.S.C. § 1962(b).

151.    At all relevant times, the Defendants were employed by or participated in the association-in-fact and were engaged in interstate commerce and conducted or participated that enterprise's affairs through a pattern of racketeering activity or collection of unlawful debts.  These acts are prohibited by the R.I.C.O. Act, 18 U.S.C. § 1962(c).

152.   As a result of the Defendants' violation of the R.I.C.O. Act, the Plaintiffs and the Class have lost a large sum in an amount to be determined at trial.

153.   As a result of their misconduct, the Defendants are liable to the Plaintiffs and the Class for their losses in an amount to be determined at trial.

154.   Pursuant to R.I.C.O., 18 U.S.C. § 1964(c), the Plaintiffs and the Class are entitled to recover threefold its actual damages, plus punitive damages, plus costs and attorneys' fees, from the Defendants.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A.    A temporary restraining order and a preliminary injunction temporarily enjoining the Conspirators from foreclosing and selling the properties of Plaintiffs and Class members pending the resolution of this case;

B.   An Order permanently enjoining the Conspirators, jointly and severally, from future foreclosures with broken chains of title, using straw-

man plaintiffs and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

C.  An Order compelling the Conspirators to provide an accounting to the Class members of all properties taken or reduced in value by mortgage foreclosures brought by the Conspirators using broken chains of title, straw-man plaintiffs, and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

D.  An Order requiring the Conspirators, jointly and severally, to pay treble damages to defrauded mortgagors in an amount sufficient to compensate them for the wrongs alleged herein, in an amount to be determined at trial;

E.  Where permitted by law, an award of restitution and disgorgement to each Class member, to remedy Conspirators' unjust enrichment, in an amount to be determined at trial.

F.  An award of reasonable attorneys' fees to the Plaintiffs;

## COUNT VII: RICO CONSPIRACY

155.  The Plaintiffs re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

156.  The Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Fed.R.Civ.P. Rule 23.

157.  At all relevant times, the Plaintiffs and the members of the Class

were "persons" within the meaning of the R.I.C.O. Act, 18 U.S.C. §§ 1961(3) and 1964(c).

158.   At all relevant times, each of the Defendants was a "person" within the meaning of the R.I.C.O. Act, 18 U.S.C. §§ 1961(3) and 1962(d).

159.   At all relevant times, the Defendants formed an association-in-fact for the purpose of defrauding the Class.

160.   At all relevant times, this association-in-fact was an enterprise engaged in and affecting interstate and foreign commerce, within the meaning of the R.I.C.O. Act, 18 U.S.C. § 1962(c).

161. The Defendants conspired to associate in fact and to combine or confederate among themselves for the purpose, by their joint efforts, directly or indirectly, to conduct the affairs of their association-in-fact through a "pattern of racketeering activity" within the meaning of the R.I.C.O. Act, 18 U.S.C. § 1961(5), in violation of R.I.C.O., 18 U.S.C. § 1962(c).

162.   At all relevant times, the Defendants ("the Conspirators") each were associated with the association-in-fact and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the association-in-fact through a pattern of racketeering activity, in violation of the R.I.C.O. Act, 18 U.S.C. § 1962(d).

163.   The Conspirators committed and caused to be committed a series of overt acts in furtherance of the association-in-fact and to affect the object thereof, including but not limited to the acts set forth above.

164.   As a result of the Conspirators' violation of the R.I.C.O. Act, 18 U.S.C. § 1962(d), the Class was injured in an amount to be determined at trial.

165.   Pursuant to the R.I.C.O. Act, 18 U.S.C. § 1964(c), the Class is entitled to recover threefold its actual damages, plus punitive damages, plus costs and attorneys' fees, from the Conspirators.

**WHEREFORE**, Plaintiffs pray for a judgment in their favor and against the Conspirators, jointly and severally, as follows:

A.   An Order certifying this action as a class action and appointing counsel to represent the Class;

B.   A temporary restraining order and a preliminary injunction temporarily enjoining the Conspirators from foreclosing and selling the properties of Plaintiffs and Class members pending the resolution of this case;

C.   An Order permanently enjoining the Conspirators, jointly and severally, from future foreclosures with broken chains of title, using straw-man plaintiffs and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

D.   An Order compelling the Conspirators to provide an accounting to the Class members of all properties taken or reduced in value by mortgage foreclosures brought by the Conspirators using broken chains of title, straw-man plaintiffs, and/or concealed bifurcated mortgages or without support for the plaintiff's claim in the records of the county recorders of deeds;

E.  An Order requiring the Conspirators, jointly and severally, to pay treble damages to defrauded mortgagors in an amount sufficient to compensate them for the wrongs alleged herein;

F.  Where permitted by law, an award of restitution and disgorgement to each Class member, to remedy Conspirators' unjust enrichment, in an amount to be determined at trial;

G.  An award of $1,000 under the FDCPA to each Class member in addition to actual damages;

H.  Punitive and exemplary damages to each Class member, in an amount to be determined at trial, in addition to actual damages;

I.  An award of damages to Plaintiffs sufficient to compensate them for Defendants' intentional infliction of emotional distress, in an amount to be determined at trial;

J.  An award of pre- and post-judgment interest to each class member, in an amount to be determined at trial;

K.  An award of reasonable attorneys' fees to the Plaintiffs;

L.  Trial by jury for all legal claims so triable;

M.  An order sanctioning Conspirator attorneys;

N.  For all other legal and equitable remedies available under the law of the United States and of Illinois for the wrongs alleged herein;

O.  Any further relief this Court may find to be just or equitable.

Dated:  November 19, 2010                    Respectfully submitted,


                                  _____/s/ Cynthia A. Stone_____
                                       Cynthia A. Stone
                                       One of the Plaintiffs

## **VERIFICATION**

I, Cynthia A. Stone, one of the Plaintiffs in the above-captioned case, hereby certify under oath that I have read the above Amended Verified Class-Action Complaint and that I believe that every paragraph of it is true to the best of my knowledge and belief.

*/s/ Cynthia A. Stone*
Cynthia A. Stone

## **VERIFICATION**

I, Robert L. Stone, one of the attorneys for the Plaintiffs, hereby certify that I personally prepared all of the exhibits to this Amended Verified Complaint and that all of the exhibits hereto are true and correct electronically scanned copies of the originals, with nothing omitted.

*/s/ Robert L. Stone*
Robert L. Stone

## **CERTIFICATE OF SERVICE**

I, Robert L. Stone, one of the attorneys for the Plaintiff, hereby certify that on November 22, I served copies of this pleading on all of the Defendants using CM/ECF and sent a notice of filing to the Defendants' attorneys at the facsimile numbers indicated on the following Service List.

Robert L. Stone
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA A. STONE et al., individually and on Behalf of All Others Similarly Situated, | )    Case No. 10 C 6410 <br> )    Judge Matthew F. Kennelly <br> ) |
|     Plaintiffs, | )    For Damages <br> )    and Equitable Relief <br> )    under the Racketeer <br> )    Influenced and Corrupt <br> )    Organizations Act |
|         v. | |
| WASHINGTON MUTUAL BANK et al., | ) <br> )    Plaintiff Demands |
|     Defendants | )    Trial by Jury |

## <u>SERVICE LIST</u>

Robert L. Stone and Cynthia A. Stone      tel: (773) 684-9321
P. O. Box 378070      fax: (773) 256-1288
Chicago, Illinois 60637-8070      e-mail:RobertLStone@yahoo.com

Federal Deposit Insurance Corporation      tel:  (312) 382-6000
as Receiver for Washington Mutual Bank      fax: (312) 382-6574
300 South Riverside Drive, Suite 1700
Chicago, Illinois 60606

Washington Mutual, Inc.      tel: (206) 461-2000
925 4th Avenue
  Suite 2500
Seattle, Washington 98104-1153

J. P. Morgan-Chase & Co.      Nisha Thornton
c/o CT Corporation      Process Specialist
208 S. La Salle Street      (312) 245-4336
Chicago, Illinois 60604      tel: (212) 270-6000
     fax: (212) 270-1648

DLJ Mortgage Capital, Inc.                         tel: (217) 544-5900
c/o Illinois Corporation Service Company           fax: (217) 492-2727
801 Adlai Stevenson Drive
Springfield, Illinois 62703


DLJ Mortgage Capital, Inc.                         tel:  (212) 325-2000
11 Madison Avenue                                  fax: (212) 743-1680
New York, New York 10010


DLJ Capital Corp.                                  tel: (217) 544-5900
c/o Illinois Corporation                           fax: (217) 492-2727
 Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703


Credit Suisse (USA), Inc.                          tel: (217) 544-5900
c/o Illinois Corporation                           fax: (217) 492-2727
 Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703


Credit Suisse (USA), Inc.                          tel: (312) 345-6000
227 West Monroe Street                             fax: (212) 743-1680
   Suite 3100
Chicago, Illinois 60606


Credit Suisse Group AG                             tel: +41-44-212-16-16
c/o Illinois Corporation Service Company           fax: +41-44-332-25-87
801 Adlai Stevenson Drive
Springfield, Illinois 62703


Douglas Roseman                                    tel: (212) 325-2000
Credit Suisse                                      fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703


Patrick A. Remmert                                 tel: (212) 325-2000
Credit Suisse                                      fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Andrew Kimura                                    tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Lori M. Russo                                    tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Bruce Kaiserman                                  tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Angelo Bulone                                    tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Michael Criscito                                 tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

James D. Criscito                                tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Lubomir Penev                                    tel: (212) 325-2000
Credit Suisse                                    fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Terence Dolce                                    tel: (212) 325-2000

Credit Suisse                                        fax: (212) 325-6665
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Select Portfolio Servicing, Inc.           tel: (217) 544-5900
c/o Illinois Corporation Service Company   fax: (217) 492-2727
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Select Portfolio Servicing, Inc.           tel: (801) 293-1883
3815 South West Temple               fax: (801) 293-3943
Salt Lake City, Utah 84115

Timothy J. O'Brien                    tel: (801) 293-1883
Select Portfolio Servicing             fax: (801) 270-7856
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Diane Weinberger                    tel: (801) 293-1883
Select Portfolio Servicing             fax: (801) 270-7856
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, Illinois 62703

Codilis & Assocs., P.C.                tel: (630) 794-5300
15W030 North Frontage Road       fax: (630) 794-9090
Burr Ridge, Illinois 60527

David M Schultz                     tel: (312) 704-3527
Jennifer W. Weller                 fax: (312)704-3001
Hinshaw & Culbertson          e-mail: dschultz@hinshawlaw.com
    attorneys for Ernest J. Codilis, Jr.       jweller@hinshawlaw.com
    and Codilis & Assocs., P.C.
222 North LaSalle Street, Suite 300
Chicago, IL 60601-1081

Jeanelle Gray                      tel: 229-482-9387
Fidelity National Foreclosure
230 Highsmith Circle
Lakeland, Georgia 31635
Christina Allen                    tel: 229-482-9387
Fidelity National Foreclosure
230 Highsmith Circle

Lakeland, Georgia 31635

Kluever & Platt LLC                         tel: (312) 236-0077
65 East Wacker Place                        fax: (312) 236-0514
Suite 2300                                  e-mail: dkluever@kandpllc.com
Chicago, Illinois 60601

Jason D. Altman
Kluever & Platt LLC                         tel: (312) 236-0077
65 East Wacker Place                        fax: (312) 236-0514
Suite 2300                                  e-mail: jaltman@kandpllc.com
Chicago, Illinois 60601

Bank of America N.A.                        Patricia Holden
135 South La Salle Street                   Senior Vice President
Suite 362                                   tel: (312) 992-2362
Chicago, Illinois 60603                     fax: (312) 992-9551

Citibank N.A.                               tel: (800) 627-3999
69 West Washington                          fax: (718) 248-1225
Chicago, Illinois 60602

Citibank N.A.                               tel: (212) 559-1000
399 Park Avenue                             fax: (212) 559-7373
New York, New York 10043

HSBC Bank (USA) N.A.                         tel: (312) 357-3983
71 South Wacker Drive                        fax: (646) 366-3716
   Suite 2700
Chicago, Illinois 60606

HSBC Bank (USA) N.A.                         tel: (703) 883-8029
1800 Tysons Boulevard                        fax: (917) 229-5253
   Suite 50
P. O. Box 2013
McLean, Virginia 22102

PNC Bank N.A.                                tel: (312) 422-0047
135 South La Salle Street                    fax: (412) 762-7829
Chicago, Illinois 60603

PNC Headquarters                             tel: (412) 762-2000
One PNC Plaza                                fax: (412) 762-7829
249 Fifth Avenue
Pittsburgh, Pennsylvania 15222

U.S. Bank N.A.                            tel: (312) 696-1450
25 East Washington               fax: (312) 641-2103
Chicago, Illinois 60602

U.S. Bank N.A.                            tel: (612) 659-2000
U.S. Bancorp Center             fax: (612) 303-0782
800 Nicollet Mall
Minneapolis, Minnesota 55402

Wells Fargo Bank                     tel: (312) 345-4320
c/o CT Corporation              fax: (312) 263-3928
208 South La Salle Street       fax: (800) 475-1212
Suite 814
Chicago, Illinois 60604

Wells Fargo Bank                     tel: (312) 345-8620
230 West Monroe Street         fax: (312) 845-8606
  Suite 2900
Chicago, Illinois 60606

Ally Financial, Inc., d.b.a. GMAC    tel: (312) 775-6002
500 West Madison Street        fax: (312) 775-6006
  Suite 3130
Chicago, Illinois 60661-4581

Ally Financial, Inc., d.b.a. GMAC
Tower 200, Renaissance Center
MC-482-B09-C24
Detroit, Michigan 48265-1300